IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>SHERMAN JOHNSON, JR. and SARKIS LABACHYAN,<br><br>Defendants. | 8:16CR241<br><br>**MEMORANDUM AND ORDER** |

    This matter is before the Court on the oral and written Findings and Recommendation and Order (Filing Nos. 51, 53) of the magistrate judge[1] recommending the Court deny (1) defendant Sherman Johnson, Jr.'s ("Johnson") Motion to Suppress (Filing No. 42) and (2) defendant Sarkis Labachyan's ("Labachyan") Motion to Suppress (Filing No. 40). Johnson and Labachyan object to the magistrate judge's Findings and Recommendations. For the reasons stated below, both Johnson's and Labachyan's objections are overruled and both Motions to Suppress are denied.

**I.   BACKGROUND**

    On June 21, 2016, Johnson and Labachyan were traveling east on Interstate 80 in Omaha, Nebraska, in a rented white Toyota minivan with California license plates. Douglas County Sheriff's Deputy Eric Olson ("Deputy Olson") pulled the minivan over for following too closely in violation of Neb. Rev. Stat. § 60-6,140(1). Labachyan was driving and Johnson was sleeping on an inflatable mattress in the back. Deputy Olson had been working criminal interdiction along the interstate when he pulled the minivan over. At a hearing regarding the Motions to Suppress, Deputy Olson admitted the purpose of working interdiction is to use traffic violations as a way to "troll" for possible

---

    [1]The Honorable F.A. Gossett, United States Magistrate Judge for the District of Nebraska.

violators of narcotics laws. When Deputy Olson observed about four vehicles in a group that failed to have sufficient stopping distance between each of the cars, Deputy Olson chose to pull over the third car in the group because it had California license plates and his practice was to target out-of-state vehicles.

Deputy Olson approached the vehicle and noticed it had a "lived-in look," with Johnson sleeping in the back and numerous food and drink wrappers strewn about. Deputy Olson told Labachyan the reason he pulled him over, took his license and the rental agreement, and asked Labachyan to sit in the patrol car while Deputy Olson performed a record check. While Deputy Olson performed the record check, he interviewed Labachyan about his destination and purpose for the trip.[2] During the interview, Deputy Olson repeatedly informed Labachyan that he would likely give him a warning.

Labachyan told Deputy Olson that he and Johnson were traveling to East Moline, Illinois, to see Johnson's Aunt Dorothy who had recently been in the hospital, and that they planned to stay there for a couple of days. Deputy Olson thought this was strange since the rental agreement would expire in two days, although he conceded that a rental could be extended by simply calling the rental agency and that drug dealers would not purposely let their rental expire. Because Johnson was the renter of the vehicle, Deputy Olson went back to the Toyota to get Johnson's information and ask him several questions.

Deputy Olson asked Johnson about his travel plans while Johnson was looking for his identification. Johnson stated they were briefly stopping in Lincoln, Nebraska, to

---

[2] Deputy Olson admitted at the hearing that these questions were neither small talk nor related to the traffic infraction but attempts at "trolling" incriminatory information from Labachyan so that he could "twist and turn" the answers to justify further investigation.

2

visit his cousin[3] before going to East Moline to see his Aunt Jenette where he planned to stay for a couple of days. Deputy Olson asked Johnson if he or Labachyan had ever been arrested; Johnson admitted he had been arrested for "weed," but he stated Labachyan had never been arrested.

Deputy Olson returned to the patrol car and asked Labachyan who the pair was planning on visiting and if they were planning on stopping before East Moline. Labachyan said they were visiting family and did not plan to stop before East Moline. Deputy Olson asked if the family member's name was Dorothy, to which Labachyan replied that it was a big family. Deputy Olson asked Labachyan if he had ever been arrested, and Labachyan replied that he had never been arrested.

Deputy Olson then asked Labachyan if there were any weapons in the car and Labachyan said there were none. While running a record check for arrests, Deputy Olson asked Labachyan why they chose to drive instead of fly. Labachyan said they should have flown but drove to see the scenery. As Deputy Olson conducted the traffic stop, another officer, Deputy David Wintle ("Deputy Wintle") arrived on the scene in response to Deputy Olson's earlier request for backup.

Deputy Olson's record check uncovered that Labachyan had never been arrested but was stopped in Lancaster County, Nebraska, a few months earlier while with Johnson. Deputy Olson was also told that officers had seized $19,000 of suspected money and some personal use marijuana from the pair. Although the report of the stop was accurate, the information that officers had seized money was inaccurate.[4] Deputy Olson asked Labachyan if he had been stopped in Lancaster County and had money or

---

[3]Johnson and Labachyan were travelling east on Interstate 80 when they were pulled over. Lincoln is west of Omaha, so they had already passed Lincoln at the time of the traffic stop.

[4]Deputy Olson did not learn about the falsity of the information about the money seizure until after the arrest of Johnson and Labachyan and the discovery of illicit drugs.

3

marijuana taken from him. Labachyan admitted he had been stopped but denied having money or marijuana taken from him.

Deputy Olson asked Labachyan in succession if there were "any large amounts of currency in the vehicle," "anything illegal in the vehicle," "any large amounts of marijuana in the vehicle," "heroin," "cocaine," "methamphetamine," or "weapons of any sort." Labachyan responded "no" to each of the questions in turn. Deputy Olson asked why Dorothy had been in the hospital and Labachyan answered that it was heart stress. Deputy Olson then ran an arrest check on Johnson and asked Labachyan if they had stopped in Lincoln or if Johnson had family in Lincoln. Labachyan said they had not stopped in Lincoln but Johnson did have family there.

Deputy Olson expressed surprise at the cost of the rental, about $1,000, to which Labachyan replied that he might seek a discount. Deputy Olson concluded his arrest check on Johnson and gave Labachyan an oral warning for the traffic violation. Deputy Olson then told Labachyan that he was going to ask Johnson some more questions. Labachyan attempted to exit the vehicle, but Deputy Olson motioned for him to close the door and told him to "just stay right here for a second."

Deputy Olson approached the Toyota where Johnson was on the phone. Deputy Olson asked Johnson to get off the phone and they had a brief conversation about Johnson's family. The following exchange then took place:

| | |
|---|---|
| Deputy Olson: | I'm going to give [Labachyan] a warning for everything. Following too close and speeding, okay? He tells me there's nothing illegal inside the vehicle, is that right? |
| Johnson: | No there's not. |
| Deputy Olson: | Okay. There's no narcotics of any sort? No weapons of any sort? |
| Johnson: | No. |
| Deputy Olson: | No large amounts of currency? |

4

| | |
|---|---|
| Johnson: | Nothing. |
| Deputy Olson: | Were you guys stopped in April in Lancaster County? |
| Johnson: | I believe so yes. |
| Deputy Olson: | Did they take some marijuana from you? |
| Johnson: | Yeah, that was just some recreational- |
| Deputy Olson: | You don't have anything like that now? |
| Johnson: | Nothing. |
| Deputy Olson: | Here's your driver's license. |

Johnson then offered that he had warned Labachyan in the past to drive more carefully.  Deputy Olson asked Johnson some more questions, including the pair's current employment status.  The exchange then resumed:

| | |
|---|---|
| Deputy Olson: | He said there's nothing illegal inside here, right? |
| Johnson: | No, of course not. |
| Deputy Olson: | Ok, can we search this vehicle? |
| Johnson: | Can you search it? |
| Deputy Olson: | Yeah. |
| Johnson: | Yeah, there's nothing in here. |
| Deputy Olson: | Ok, you wanna step out here?  What property in here is yours? |
| Johnson: | All of it. |
| Deputy Olson: | I just want to point out what bags are his. |
| Johnson: | This is all food, just food. |
| Deputy Olson: | And there's no weapons or anything in here? |
| Johnson: | Nothing. |
| Deputy Olson: | Ok.  Pop your shoes on and I'll walk you back to my car.  You give me permission to search. |
| Johnson: | This is all food. |
| Deputy Olson: | Alright, just go ahead and step back to my partner back here. |

Deputy Olson patted down Johnson and placed him in Deputy Wintle's patrol car behind Deputy Olson's patrol car where he was confined during the subsequent search. Deputy Olson returned to his patrol car where he frisked Labachyan. Deputy Olson told Labachyan that Johnson as the renter of the vehicle had given his consent to search the vehicle. Deputy Olson asked Labachyan for permission to search his bag in the Toyota, and Labachyan did not consent. Labachyan then stated that he was the driver and had studied law, but Deputy Olson cut him off and stated that Johnson as the renter of the vehicle could give or deny permission to search. Labachyan asked for permission to talk to Johnson, but Deputy Olson refused.

Deputy Olson and Deputy Wintle began to search the interior of the minivan. After searching the interior, Deputy Wintle went underneath the vehicle and started to examine the spare tire. Deputy Wintle reached under the car to inspect the clamp that attached the tire to the vehicle. After barely turning it, the tire fell to the ground. Deputy Wintle pulled the tire out from under the car and dropped the tire while listening to the sound it made. He was able to determine that there was something solid inside the tire. After determining that there was something in the tire, Deputy Olson formally arrested Labachyan and Johnson and placed them in handcuffs. After arresting the pair, Deputy Olson and Deputy Wintle cut open the tire to reveal a number of heat-wrapped bundles. The heat-wrapped bundles were later confirmed to contain over five kilograms of cocaine.

On November 21, 2016, Johnson and Labachyan each moved to suppress the evidence derived from the traffic stop and the search of their vehicle, as well as any evidence obtained after they were taken into custody. The magistrate judge held an evidentiary hearing and Deputy Olson, Deputy Wintle, and Labachyan testified as witnesses. The magistrate judge admitted into evidence a video and audio recording of the stop created from two cameras and a microphone in Deputy Olson's cruiser and a microphone that Deputy Olson was wearing.

After considering the evidence and the parties' respective arguments, the magistrate judge determined the traffic stop was valid and, after the traffic stop ended, Deputy Olson had reasonable suspicion to extend the stop. The magistrate judge also found that after Deputy Olson extended the stop, Johnson voluntarily consented to the search and did not limit the scope of the search or terminate his consent. The magistrate judge recommends the Court deny both Motions to Suppress.

## II. DISCUSSION

### A. Standard of Review

Under 28 U.S.C. § 636(b)(1), the Court may designate a magistrate judge to conduct an evidentiary hearing and submit "proposed findings of fact and recommendations for the disposition" of a motion to suppress. The Court then must "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id.* "The district judge may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions." Fed. R. Crim. P. 59(b)(3).

### B. Failure to *Mirandize*

Labachyan argues that he was entitled to be advised of his *Miranda* rights before questioning because he was subject to custodial interrogation while in the patrol car. *See Miranda v. Arizona*, 384 U.S. 436 (1966). However, an individual seized in a traffic stop is not entitled to a *Miranda* warning unless a reasonable person in the suspect's position would have understood himself to be under arrest. *Berkemer v. McCarty*, 468 U.S. 420, 441-42 (1984). During the traffic stop, Deputy Olson repeatedly told Labachyan that he would likely be given a warning, and Labachyan had no reasonable belief that this was not true. The fact that Deputy Olson placed Labachyan in the patrol car did not convert the stop into an arrest. "Asking a driver to exit the car [is] not the 'functional equivalent of formal arrest.'" *United States v. Rodriguez*, 711 F.3d 928, 935 (8th Cir. 2013)

7

(quoting *Berkemer*, 468 U.S. at 442). Labachyan was not in custody that required a *Miranda* warning while Deputy Olson questioned him.

### C. Extension of the Stop

After a police officer has completed a traffic stop, the original traffic violation can no longer justify detaining the inhabitants of the vehicle. *Rodriguez v. United States*, 575 U.S. ___, ___, 135 S. Ct. 1609, 1614 (2015). A police officer who prevents the inhabitants from leaving after the conclusion of the traffic stop violates their Fourth Amendment right to be free from unreasonable seizures. *Id*. If, for example, a police officer without reasonable suspicion completes the traffic stop by giving the driver a ticket but prevents the driver from leaving so the officer can perform a dog sniff, then the post-traffic-stop seizure would be unconstitutional. *Id*. at 1616. Only a police officer who has reasonable suspicion that another crime is being committed may extend the stop after the conclusion of the traffic stop. *Id*. at 1616-17.

However, merely looking at when the extension occurs would create perverse incentives. If performing actions unrelated to the traffic stop were prohibited only after the end of the traffic stop, police officers would be able to perform investigatory functions completely unrelated to the traffic stop so long as they occurred prior to the termination of the stop. For example, a police officer could perform the dog sniff before giving the driver a ticket. To prevent this, the test for whether performing actions unrelated to the traffic stop violates the Fourth Amendment is whether those actions prolong the stop. *Id*. at 1616. "The critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket, . . . but whether conducting the sniff 'prolongs'—i.e., adds time to—'the stop[.]'" *Id*. "An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop . . . . [b]ut . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id*. at 1615.

8

### 1. Initial Questioning

Defendants argue that the initial questioning of Labachyan exceeded the scope of the traffic stop by prolonging the stop. Questions that do not seem related to the traffic stop may indeed be related to the traffic stop if they deal with officer safety or the safety of other drivers on the road. *See id.* at 1616 (explaining that inquiries such as checking for outstanding warrants or an arrest record are "negligibly burdensome precautions" for officer safety). By Deputy Olson's own admission, the questions he asked Labachyan and Johnson were subjectively unrelated to the traffic stop or to his safety or the safety of other drivers; the questions were attempts to gather enough information to pursue an investigation. At the time of Deputy Olson's questioning of Labachyan, he did not have reasonable suspicion that Labachyan was involved in drug trafficking. However, Deputy Olson was performing standard traffic stop tasks while he questioned both Labachyan and Johnson. Since the questioning was undertaken while Deputy Olson was progressing the traffic stop, he did not prolong the stop.

### 2. Reasonable Suspicion

After Deputy Olson told Labachyan he was receiving a warning, terminating the traffic stop, Deputy Olson kept Labachyan in the car so he could talk to Johnson and attempt to get consent to search the vehicle. Further, Deputy Olson prevented Labachyan from talking to Johnson after receiving Johnson's consent. This was a seizure of Labachyan. Any seizure of Labachyan is also a seizure of Johnson, since Johnson would not be free to go without Labachyan. Unless Deputy Olson had reasonable suspicion that a crime was being committed, Deputy Olson's seizure of the pair could constitute a Fourth Amendment violation.

The government claims ten observations gave Deputy Olson reasonable suspicion that a crime was being committed: (1) the vehicle had California license plates, (2) the vehicle came from California, (3) the vehicle had a "lived in" look, (4) the trip was for a long distance but the rental was about to expire with no time to stay, (5) the rental was

9

about to expire, (6) the rental was expensive, (7) Labachyan said he wanted to see the sights but was driving straight through, (8) Labachyan and Johnson had different names for the aunt and disagreed about stopping in Lincoln, (9) Johnson had a prior arrest for marijuana, and (10) Deputy Olson receiving information that $19,000 in cash was previously seized from Labachyan and Johnson.

Reasonable suspicion requires specific and articulable facts. *Terry v. Ohio*, 392 U.S. 1, 21 (1968). "While 'reasonable suspicion' must be more than an inchoate 'hunch,' the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop." *United States v. Lyons*, 486 F.3d 367, 371 (8th Cir. 2007). "Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances." *United States v. Beck*, 140 F.3d 1129, 1137 (8th Cir. 1998) (quoting *United States v. Halls*, 40 F.3d 275, 276 (8th Cir. 1994)). However, in order to measure the totality of the circumstances, it is necessary to first break the reasonable suspicion into separate observations. *See Beck*, 140 F.3d at 1137-39 (analyzing each observation separately before combining them in a totality of the circumstances test).

The first two observations are essentially the same: the car originated in California. The Eighth Circuit has stated that "we do not think that the entire state of California, the most populous state in the union, can properly be deemed a source of illegal narcotics such that mere residency in that state constitutes a factor supporting reasonable suspicion." *Beck*, 140 F.3d at 1137. However, the circuit court has also declared California a drug source state and decided the following factors constituted probable cause: (1) a trip that originated in California, (2) the finding of a large amount of money wrapped in scented dryer sheets, placed inside three layers of Ziploc bags, and hidden in the ceiling of the automobile with the driver unable to produce tax records, and (3) inconsistencies in the driver's story about how he received the funds. *United States v.*

*$141,770.00 in United States Currency*, 157 F.3d 600, 604 (8th Cir. 1998); *see also United States v. Kelly*, 329 F.3d 624, 628 (8th Cir. 2003) (determining probable cause existed to arrest when (1) the state of origin was a drug source state, (2) the defendant registered for his room under a different name, (3) the defendant paid cash for two rooms, (4) the co-defendant gave three unrelated explanations for their trip, (5) the hotel security guard smelled marijuana, and (6) their luggage contained a kilogram of cocaine).

The third observation was that the minivan had a "lived in" look with food and drink wrappers in the car when Deputy Olson approached. Food and drink wrappers are "ubiquitous in modern interstate travel and do not serve to separate the suspicious from the innocent traveler." *Karnes v. Skrutski*, 62 F.3d 485, 496 (3rd Cir. 1995). "The possession of . . . vestiges of fast-food meals describes a very large category of presumably innocent travelers . . . and any suspicion associated with these items is virtually nonexistent." *United States v. Wood*, 106 F.3d 942, 947 (10th Cir. 1997). "The mere presence of fast-food wrappers . . . is entirely consistent with innocent travel. *Beck*, 140 F.3d at 1138 (citing *Wood*, 106 F.3d at 947 and *Skrutski*, 62 F.3d at 496).

The fourth and fifth observations are again the same: Deputy Olson found it suspicious that the rental was about to expire. However, Deputy Olson also admitted in the hearing that drug dealers would not purposely let their rental expire. Additionally, "large number[s] of innocent travelers . . . extend their trips beyond the time originally provided for in their rental agreements. *United States v. Boyce*, 351 F.3d 1102, 1110 n.6 (11th Cir. 2003). It is common for drivers to rent a car for a period and then extend the period. *United States v. Santos*, 403 F.3d 1120, 1129 (10th Cir. 2005). "[I]nnocent travelers frequently extend rental agreements[.]" *United States v. Williams*, 808 F.3d 238, 250 (4th Cir. 2015).

The sixth observation is that the rental was expensive. This is not probative of anything. Deputy Olson failed to testify at the hearing about why the expense of the

11

rental was relevant. He did not mention that, in his training and experience, drug traffickers prefer more expensive rental cars. A mere observation without reasoning behind it does not constitute a factor of reasonable suspicion.

The seventh factor is that Deputy Olson was suspicious of Labachyan saying he wanted to see the sights while they were driving without stopping, but Labachyan never said he wanted to see the sights. On the tape, Labachyan is clearly heard to say he wanted to "see the scenery." "There is nothing criminal about traveling by car to view scenery." *Wood*, 106 F.3d at 947. Driving from California to Illinois provides plenty of time and opportunity to view scenery, even when part of the traveling is done at night.

The eighth observation is that Labachyan and Johnson gave different names for the aunt and different answers about stopping in Lincoln. In *United States v. Gill*, the defendants gave a police officer contradicting statements about their travel plans. 513 F.3d 836, 845 (8th Cir. 2008). One stated they were traveling to Ohio to see a sick grandmother, while the other stated they were traveling to Iowa with no mention of a sick grandmother. *Id*. The defendants also gave different answers about how many children and grandchildren were in their extended family. *Id*. While the discrepancies in Labachyan and Johnson's stories were less than in *Gill*, both agreed that they were headed to East Moline for a couple of days to see Johnson's family, they disagreed on which family member in particular they were seeing as well as whether they were planning on stopping in Lincoln, which they had already passed.

The ninth observation is that Johnson had prior arrests for narcotics violations. Johnson told Deputy Olson that he had been arrested previously for "weed" but was not more specific, nor did he mention there were multiple arrests. Failure to be forthright about criminal history can cast suspicion on an individual. *United States v. Riley*, 684 F.3d 758, 764 (8th Cir. 2012). Johnson's criminal history was not extensive, but it

12

contained a highly-probative conviction for possession with intent to distribute. While Johnson did not hide past arrests, he was not particularly descriptive of them either.

The final observation that Deputy Olson relied on was that $19,000 had been seized from the pair in Lancaster County. This information turned out to be inaccurate. However, reasonable suspicion can be based on information that turns out to be false, so long as the officer had a reasonable basis for believing the information. *See, e.g., United States v. Sanders*, 196 F.3d 910, 913 (8th Cir. 1999). It was objectively reasonable for Deputy Olson to rely on information he received pursuant to a record check.

There could be innocent explanations for all of the factors that Deputy Olson cited. However, "factors consistent with innocent travel can, when taken together, give rise to reasonable suspicion." *Beck*, 140 F.3d at 1137 (citing *United States v. Sokolow*, 490 U.S. 1, 10 (1989). Especially probative are the inconsistent stories about the pair's itinerary, Johnson's criminal history, and the information Deputy Olson received about a cash seizure. These factors, especially when combined with all the others, are sufficient for a finding of reasonable suspicion. *See Riley*, 684 F.3d at 764 (finding reasonable suspicion when defendant exhibited nervousness, had difficulty in answering simple questions about his travel plans, and failed to totally disclose his drug-related criminal history). Deputy Olson did not violate the Fourth Amendment when he seized Johnson and Labachyan because he had reasonable suspicion a crime was being committed.

### D. Voluntariness of the Consent to Search

Voluntary consensual searches do not violate the Fourth Amendment. Consent is given voluntarily if it is a free choice and not the "product of duress or coercion, express or implied." *United States v. $231,930.00 in United States Currency*, 614 F.3d 837, 844 (8th Cir. 2010) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)). In *United States v. Chaidez*, the Eighth Circuit provided factors to examine when determining voluntariness. 906 F.2d 377, 381 (8th Cir. 1990). Personal characteristics to examine are (1) age, (2) intelligence and education, (3) intoxication, (4) the giving of

13

*Miranda* warnings, and (5) prior arrests which would educate the person giving consent of the protections of the legal system. *Id*. Environmental characteristics to consider are (1) length of detention, (2) threats or physical violence, (3) police promises or misrepresentations, (4) level of custody or arrest, (5) the public or secluded nature of the location, and (6) if the person giving the consent objected to the search or watched silently. *Id*.

Johnson, an adult male with no indication of below-average intelligence, was not intoxicated at the time he gave consent. He had also been arrested previously, but he was not *Mirandized* by Deputy Olson. The detention was less than half-an-hour, there were no threats or promises made by Deputy Olson, and the consent was given on a busy interstate highway. While Johnson was in custody at the time he gave consent, it was not formal arrest. Johnson was unable to object to the search since he was removed from the area prior to the beginning of the search. When taken as a whole, these factors overwhelming lean toward a finding of freely given consent and show Johnson's consent to search was given voluntarily and not as a result of duress or coercion.

      E.    **Labachyan's Failure to Consent**

If two individuals both possess a privacy interest in a common area, the objection of one individual to a search overrides the consent of the other individual and renders the products of the search inadmissible against the objecting party. *Georgia v. Randolph*, 547 U.S. 103, 122-23 (2006), *but see United States v. Lumpkins*, 687 F.3d 1011, 1014 (8th Cir. 2012) (questioning whether *Randolph* applies to vehicles). However, if one individual consents and the other is silent, the products of the search are admissible against both parties, even if the silence is due to the other individual being detained by police for objectively reasonable purposes. *Fernandez v. California*, 571 U.S. ___, ___, 134 S. Ct. 1126, 1129-31 (2014).

Even if Labachyan and Johnson both had a reasonable expectation of privacy in the vehicle, and each was able to consent or object to a search by police, Johnson's

14

consent would be void against Labachyan only if Labachyan objected to the search. Labachyan failed to explicitly object to the search and so Johnson's consent is binding against him even if Labachyan had a privacy interest in the vehicle.

### F. Scope of the Consent

The scope of consent is governed by a reasonableness inquiry. *United States v. Alvarez*, 235 F.3d 1086, 1088 (8th Cir. 2000) (citing *United States v. Martel-Martines*, 988 F.2d 855, 858 (8th Cir. 1993)). The standard is what "the typical reasonable person [would] have understood by the exchange between the officer and the suspect." *United States v. Siwek*, 453 F.3d 1079 (8th Cir. 2006) (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)). Cutting open a spare tire exceeds a reasonable understanding of consent to search a vehicle, but an echo test that indicates material inside the tire constitutes probable cause to search the tire. *Alvarez*, 235 F.3d at 1089.

The exchange between Johnson and Deputy Olson in its entirety would lead a reasonable person to believe the consent was to search the entire vehicle. The specific question posed to Johnson was, "Can I search the vehicle?" Johnson responded with "yeah" and did not limit the consent in any fashion. The spare tire attached to the vehicle was within the scope of consent. While cutting open the spare tire would exceed the consent given, once Deputies Wintle and Olson determined there was something solid in the tire, they had probable cause to cut open the tire. *See United States v. Ross*, 456 U.S. 798, 825 (1982) (explaining that a finding of probable cause allows police to search every part of a vehicle). The search did not violate the Fourth Amendment because it was consensual up to the point the deputies had probable cause to cut open the tire.

### G. Standing

The government does not dispute that Johnson has standing to object to the initial traffic stop, subsequent seizure, and search of the vehicle, or that Labachyan has standing to object to the initial stop and subsequent seizure. The government does claim that because Labachyan was merely the driver and not the renter of the vehicle, Labachyan

15

had no legitimate expectation of privacy in the vehicle and, therefore, does not have standing. Because the search did not violate the Fourth Amendment, the Court declines to reach the issue of standing.

### III. CONCLUSION

Deputy Olson's traffic stop, seizure, and search did not violate the Constitution. Deputy Olson had probable cause to make the stop, did not prolong the stop, and received voluntary consent to search the vehicle. Because there was no Fourth Amendment violation,

IT IS ORDERED:
1. Defendant Sherman Johnson, Jr.'s objection (Filing No. 56) to the magistrate judge's Findings and Recommendation is overruled.
2. Defendant Sarkis Labachyan's objection (Filing No. 60) to the magistrate judge's Findings and Recommendation is overruled.
2. The magistrate judge's Findings and Recommendation (Filing Nos. 51 and 53) are accepted.
3. Defendant Sherman Johnson, Jr.'s Motion to Suppress (Filing No. 42) is denied.
4. Defendant Sarkis Labachyan's Motion to Suppress (Filing No. 40) is denied.

Dated this 9th day of March, 2017.

BY THE COURT:

s/ *Robert F. Rossiter, Jr.*
United States District Judge